IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 1998 SESSION

FILED

May 7, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. 03C01-9707-CC-00314 |
| | * | |
| Appellee, | * | ANDERSON COUNTY |
| | * | |
| VS. | * | Hon. James B. Scott, Jr., Judge |
| | * | |
| WILLIE D. GRAHAM, | * | (Voluntary manslaughter) |
| | * | |
| Appellant. | * | |

For Appellant:                    For Appellee:

J. Thomas Marshall, Jr.           John Knox Walkup
Public Defender                   Attorney General and Reporter
101 South Main Street
Clinton, TN  37716                Elizabeth B. Marney
                                  Assistant Attorney General
                                  Criminal Justice Division
                                  425 Fifth Avenue North
                                  Nashville, TN  37243-0493

                                  Jan Hicks
                                  Assistant District Attorney General
                                  127 Anderson County Courthouse
                                  Clinton, TN  37716

OPINION FILED:_____

REVERSED AND REMANDED

GARY R. WADE, JUDGE

<u>OPINION</u>

Indicted for first degree murder, the defendant, Willie D. Graham, was convicted of voluntary manslaughter in the death of his brother-in-law, Ray Anthony Shervington. The trial court imposed a Range I sentence of six years.

In this appeal of right, the defendant presents the following issues for our review:

(I)  whether the evidence is sufficient to sustain the conviction;

(II)  whether the trial court erred by allowing the state to use peremptory challenges based on gender;

(III)  whether the trial court erred by refusing to instruct the jury on the lesser included offenses of reckless homicide and criminally negligent homicide;

(IV)  whether the trial court erred by allowing the state to impeach the defendant with prior convictions for selling marijuana; and

(V)  whether the trial court erred in sentencing and in denying probation.

Because the trial court failed to charge each of the lesser offenses, we must reverse the judgment of the trial court and remand the cause for a new trial.

Ann Shervington, the defendant's sister, is the widow of the victim. The Shervingtons, who were married in 1983, have two daughters. Tamisha was twelve years old at the time of trial and Keisha was eight. Elizabeth Graham, the mother of the defendant and Ann Shervington, is affected with Alzheimer's disease and resides only a few houses away from the Shervingtons. At approximately 10:00 A.M. on Sunday, July 30, 1995, Ann Shervington, Paul "Bud" Byrum, Tommy Littlejohn, the victim and the defendant had gathered in the Graham backyard. They

2

socialized and drank beer for much of the morning and afternoon.  Ms. Graham spent the day inside the house.

The Shervingtons, who had each consumed about three quarts of beer over the course of the day, left about 5:30 P.M. to purchase more beer.  While unaware of the amount of alcohol ingested by the defendant, Ms. Shervington described the victim as "pretty high" because he had consumed a lot of alcohol the previous night.  She did not recall unpleasantness between the victim and the defendant or Ms. Graham.  While conceding that she had argued with the victim, she revealed that that was not unusual.

When Jerry Weaver arrived, at about 9:00 P.M., Ms. Shervington recalled that the defendant and the victim began to argue.  Both of the men entered the back door of the house.  Ms. Shervington followed, saw the victim on the front porch with his hands outstretched toward the defendant, and then heard the defendant say, "Go on, man.  Go on, man."  She testified that the two men stood chest to chest.  From fifteen to twenty feet away, Ms. Shervington saw the defendant draw a knife from the pocket of his shorts, open the blade beside his leg, raise the knife, and strike the victim.  She ran toward the victim, who was not wearing a shirt, and saw a bloody wound on his left side and also a wound on the right side of his chest.  Ms. Shervington ran to the house of her sister, Mary Graham, who lived next door and then to Joyce Dye's house to call for help.  Her sister attempted to stop the bleeding.  The ambulance arrived at about 10:00 P.M. When Ms. Shervington returned from the hospital at approximately 1:30 A.M., she went to the store with Littlejohn.  Upon their return to her residence, police were searching for the weapon used by the defendant.  Byrum helped them locate the knife.

3

Ms. Shervington testified that the knife was found in her front flowerbed at about 2:00 A.M. Littlejohn, Byrum, Weaver, and Willis were present at the time. Ms. Shervington acknowledged that the victim and Littlejohn had a history of conflict.

Keisha testified that she saw the victim and the defendant go in the back door of the Graham house and saw Littlejohn enter from the front porch. Within minutes she saw the defendant and the victim on the front porch. She recalled the defendant saying, "Go on, man; go on, man," while the victim held his arms extended in the direction of the defendant. Keisha testified that the defendant stabbed the victim and that she saw blood on the victim's chest, as he fell to the sidewalk. Keisha did not remember anyone else being nearby. Afterward, she ran to find her sister and informed her that "something was wrong." She denied telling Tamisha that Weaver stabbed the victim and claimed a good relationship with the defendant.

Tommy Littlejohn testified that he arrived at the Graham house at 8:00 A.M. on the day in question. He recalled that they all drank beer and got along fine throughout the day. Littlejohn recalled that he awoke from a nap when he heard Ms. Shervington crying. He then overheard the defendant say, "I'm going to jail," as the defendant handed him an open knife with blood on it. Littlejohn, who had seen the knife before, placed it inside an old television set in the back yard.

When he returned to the front yard, the victim was lying in a pool of blood. When police left the scene sometime later, he informed Ms. Shervington as to the location of the knife. He retrieved the knife, took it to the Shervington house, and placed it on a chair on her front porch near where Byrum sat. Littlejohn recalled

4

being asked to get some more beer. When he and Ms. Shervington returned, the police asked about the knife. Littlejohn showed them where he had placed it but the knife was no longer there. He subsequently learned that Byrum had thrown the knife in the side yard by a walnut tree.

Littlejohn denied ever carrying the defendant's knife into Ms. Graham's front yard. He recalled that the defendant was uncharacteristically quiet that day. Littlejohn did not, however, hear anyone threaten anyone else. He acknowledged that he and the victim had experienced trouble in the past and that, in fact, he had shot the victim in 1990, yet he denied that there was any recent ill-feeling. Littlejohn also admitted that in August of 1995, Ms. Shervington had called the sheriff to remove him from her home.

Paul "Bud" Byrum testified he was in the house with Littlejohn and Ms. Shervington on the day of the stabbing. The defendant was in the kitchen when the victim entered the back door. An argument ensued and the two men went toward the front porch, followed by Ms. Shervington. Byrum testified that he did not see a knife. He did notice Littlejohn follow Ms. Shervington outside. Byrum recalled that he left by way of the backdoor, went to the Shervington house, and sat on the porch. He learned the victim had been killed when Ms. Shervington returned from the hospital. He saw Littlejohn place a knife on a chair next to him. He described the knife blade as closed; it was too dark to see whether there was blood on it. Byrum testified that he kicked the knife off of the porch but pointed out its location when police arrived.

Lieutenant Penny Baker testified that she located a lock-blade knife on the Shervington property. When she found the knife, the blade was closed.

5

Hugh Kring, a paramedic with the Anderson County E.M.S., arrived at the Graham residence at about 10:00 P.M. The victim, in critical condition, was lying in a supine position in front of the house. Police arrived within four to seven minutes. Kring transported the victim to Lakefront Park in Clinton and the Lifestar helicopter flew the victim to the University of Tennessee Hospital in Knoxville.

Rick Harrington, a Lifestar flight paramedic, chemically paralyzed the victim, inserted a tube into his windpipe, and provided blood and fluids. Conscious but not alert, the victim was in severe shock. The victim maintained a pulse during the twelve minute flight and no resuscitation was required. Harrington did not recall smelling any alcohol as he treated the victim.

Dr. Richard Clark, whose specialty is emergency and internal medicine, treated the victim in the emergency room at 11:19 P.M. Dr. Clark and his staff employed life-saving procedures for fifteen or sixteen minutes, all of which failed. The victim died at 11:31 P.M.

Dr. Cleland Blake, a forensic pathologist, performed the autopsy and described the victim as a young, black male, five-feet-eleven-inches tall, and weighing 200 pounds. Dr. Blake found that the victim had suffered three stab wounds to his chest. A downward diagonal wound to the right side caused a collapse of the right lung and was of a lethal nature. A second wound to the left side of the chest, pierced the heart and punctured the lung cavity. This wound was also lethal and would have bled profusely. A third wound along the victim's left rib cage was angled steeply downward, entering the chest wall but not the lung cavity. Death resulted from the two wounds to the front of the chest. Dr. Blake testified that all three wounds were consistent with having been made by the same knife and that

6

the lock-blade knife with the chip in the blade could have made these wounds. It was his opinion that the kitchen knife, which was more slender and had a serrated edge, would have produced as smaller, serrated type wound not present here.

Dr. Blake could not determined the order of the wounds. He recognized the possibility that the two lethal wounds could have been inflicted when the victim was lying flat. He found no defensive wounds other than some minor scratches on the back of the victim's fingers. The victim had grass on his hands consistent with a fall. While acknowledging it was possible that a knife other than the two he had examined could have inflicted wounds, Dr. Blake testified that the two lethal wounds involved tearing during the penetration which was consistent with the notch in the blade of the lock-blade knife.

Deputy Richard Carr observed a large amount of blood on the sidewalk as paramedics placed the victim onto a gurney. There was blood splattered on the front porch and the steps. When Deputy Carr saw the defendant walk onto the front porch carrying a dishpan of water, he instructed him not to disturb the crime scene.

As Deputy Carl Bailey arrived on the scene, he overheard Ms. Shervington scream, "Willie cut Ray." He recalled seeing Littlejohn sitting in a chair on the front porch. Deputy Bailey took the pan of water from the defendant when it appeared he might attempt to clean the area where the victim had fallen, escorted the defendant to the patrol car, and later transported him to the county jail.

7

Deputy Bailey returned to the crime scene between 2:00 and 3:00 A.M. to search for the knife. He initially searched the front porch of the Graham residence and continued his search at the Shervington house.

No fingerprints were found on the lock-blade knife. The victim's blood alcohol level was 0.16 percent. Michael Lyttle, a forensic scientist, testified that a person with a blood alcohol level that high would experience diminished judgment and reaction time, have slurred speech, and perhaps an altered gait. He explained that some heavy drinkers might develop a behavioral tolerance. He testified that humans metabolize alcohol at a rate of 0.01 to 0.02 percent per hour and that metabolism ceases at death.

Mark Squibb, a TBI serologist, tested the serrated knife and found no blood present. His tests indicated that human blood was present on the lock-blade knife but he could not type it conclusively. He found human blood on the defendant's shirt under the left armhole, under the neckline, in the center of the left side, and on the chest area.

Squibb also tested blood samples taken from the defendant and the victim. He determined that the blood found on the shoes of the defendant was consistent with that of the victim according to one test but inconsistent with that of the victim according to another.

Sergeant William Breeding testified that he took three statements from the defendant, who did not appear to be intoxicated. In the initial conversation, he stated that he was standing in the kitchen when Ms. Shervington and the victim began to argue. Ms. Graham told the victim to go and then he repeated the order.

He claimed that he walked back toward the kitchen and then heard that Ms. Shervington had gone to Mary Graham's house to call an ambulance. He insisted that he next saw Ms. Shervington standing over the victim as he lay outside on the sidewalk.

At about 2:20 A.M., Sergeant Breeding and Detective Townes questioned the defendant a second time after he had been booked. He provided the officers with substantially the same statement that he had given a few hours earlier. The defendant claimed that he asked the victim why he brought fights over to his house, then walked away, and about three minutes later, heard Ms. Shervington call for help.

The defendant made a third statement to Sergeant Breeding at 5:10 A.M. By then the victim had died and the suspected murder weapon had been located. The defendant stated as follows:

> I was at 106 Coward Road, Clinton, Tn, where I live with my mother. Ann Shervington, Tommy Littlejohn, my mother Elizabeth, and Ray were all there. Ann and Ray were arguing with each other, my mother had told Ray to get out of the house. I came from the kitchen and Ray was inside the house near the door. I told everyone that they needed to go somewhere else, because Ray had been fussing with Ann and Tommy. Ray then started fussing and pushing my mother. I told him he had to go and mom told Ann she was going to have to go. Ray started pushing and grabbing me and I hit him with the knife. I walked into the kitchen. Ray turned around and walked toward the door. Mom told Ann again she was going to have to go. I took the knife in the kitchen and put it on the table and started cooking. The knife was about 6 or 8 inches long and looked like a steak knife[. I]t has grooves in the blade. About 5 or 6 minutes later I heard Ann screaming and I walked out of the kitchen, and through the house and out on the porch with my mother and saw Ray laying on the sidewalk. I looked down at him and my sister was over him and he was talking, then I saw the blood and I went down to Mary's house and told her to call the ambulance, and she said they had already been called. I went back up to the

house.  Mary walked up there too.  Ann had a rag holding
it on Ray, by then the ambulance came.

This statement was signed but unrecorded.  The two previous statements were not recorded or reduced to writing.

In addition to the lock-blade knife, Sergeant Breeding seized from the Graham house three other weapons: a serrated steak knife from the kitchen, a knife without a handle from the kitchen sink, and a long-bladed knife found on the floor of a bedroom.  Only the serrated knife and the lock-blade knife were tested by TBI.  Breeding testified that the lock-blade knife could be opened with one hand.  He conceded that the victim's clothing was not tested.

Alex Witherspoon, the six-year-old nephew of defendant, testified for the defense.  Alex remembered that the victim argued with Ms. Graham and Weaver.  He testified that he saw the defendant put down the knife he was using and saw Weaver pick it up.  Alex claimed that he left the house briefly and that when he returned, the defendant raised a butcher knife toward the victim.  Alex then corrected himself, saying that it was Weaver, not the defendant, that he saw raise the knife.  He explained that he did not see the stabbing.

Mary Graham, sister to the defendant, had returned from work at about 10:00 P.M. on the date of the homicide.  She confirmed that her son, Alex, had gone next door to his grandmother's house to retrieve a toy.  About ten minutes later, he returned.  Ms. Shervington, who followed, was screaming at the door.  Ms. Graham testified that when she did not answer the door, Ms. Shervington left.  She explained that Ms. Shervington, her sister, often fought with the victim and screamed for help; usually her concerns were unfounded.  A few minutes later, Keisha and Tamisha returned and asked her to call an ambulance.  Ms. Graham testified that she did

10

nothing because she did not believe them. She then called the police, went to her mother's house, and observed the victim lying on his back near the front steps. She recalled that Ms. Shervington was treating the victim's stab wounds.

The defendant testified that he worked at the plants in Oak Ridge from 1976 to 1986, when he hurt his back and contracted a lung disease. At the time of the victim's death, he lived with and cared for his mother.

The defendant, who denied being intoxicated, testified that there had been arguments that evening between Weaver and Littlejohn. He claimed that he had returned to the kitchen to prepare supper when the victim entered the house and began to argue. The defendant insisted that he walked away and the victim and Ms. Shervington began to argue. The defendant recalled that his mother ordered them to take their argument elsewhere. The defendant testified that when the victim also argued with Littlejohn, he directed the victim to "[G]o on out of here [and g]ive my mom a break." The defendant claimed that he also directed Ms. Shervington to leave.

The defendant insisted that the Shervingtons continued to quarrel with his mother and that the victim pushed her. He testified that the victim attacked with both hands. The defendant, who was holding a knife he had used to cut onions, "felt cutting, and I just pushed him off of it. Which at the time I hit him, stabbed him, I guess. I hit him right here [in the left shoulder]." He recalled that the victim turned and walked onto the front porch then Littlejohn took the knife, saying, "You don't need this no more."

11

The defendant described his knife as a brown handled butcher knife. He testified that when Littlejohn returned, he said, "[T]he son-of-a-bitch has died and he deserved to die." The defendant heard Ms. Shervington crying for an ambulance and saw the victim outside on the ground. He contended that he remained at the scene until the authorities arrived. The defendant denied having any animosity toward the victim and insisted that he stabbed the victim only once. While denying that he had implicated Weaver to the police, he asserted that he did not kill the victim. The defendant admitted that he had two felony convictions for selling marijuana in 1992.

## I

The defendant first challenges the sufficiency of the evidence. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. "'Intentional' refers to a person who acts intentionally with respect to the nature of

the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). "'Knowing' refers to a person who acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Here, there was proof that the defendant removed a knife from his pocket, opened the blade, and stabbed the victim in the chest. A deep stab wound to the chest is reasonably certain to cause death. A pathologist testified that of the three chest wounds, the right and left chest wounds were lethal. Ms. Shervington claimed to have seen the defendant stab the victim. She saw wounds in both the left and right sides of his chest. From this, the jury could have concluded that the defendant inflicted either or both of the more serious wounds. There was also proof that the defendant and the victim had argued and that the victim had pushed the defendant's ailing and elderly mother. A jury could have determined that the defendant acted under provocation. In our view, the evidence was clearly sufficient to support a conviction for voluntary manslaughter.

II

Next, the defendant asserts that he had established a prima facie case of purposeful gender discrimination in the state's use of its peremptory challenges. The state insists that no constitutional violation occurred because the prosecutor provided neutral reasons for its challenges to male jurors.

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated his right to equal protection under the fourteenth amendment to the U.S. Constitution. See also Tenn. Const., art. I, § 9. In Powers v. Ohio, 499 U.S. 400 (1991), the Supreme Court upheld the principles of Batson but eliminated the requirement that the defendant and the wrongfully excluded juror be of the same race in order for there to be an equal protection claim. See State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992). The Court extended the Batson rule and rationale to the use of peremptory challenges based on gender in J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994). Our supreme court adopted that ruling in State v. Turner, 879 S.W.2d 819 (Tenn. 1994). Thus, we apply the standards for determining racial discrimination, as set forth in Batson and its progeny, to peremptory challenges where gender discrimination is alleged.

When the defendant is able to establish a prima facie case of purposeful discrimination against a prospective juror based on gender, the prosecution must then come forward with a gender-neutral explanation for the challenge of the juror. J.E.B, 511 U.S. at 144-45. The explanation does not have to rise to the level of justifying a challenge for cause, so long as the explanation is based on a characteristic of the juror other than gender and is not pretextual. Id. at 145. That is, the state must "'articulate a neutral explanation related to the particular case ....'" Ellison, 841 S.W.2d at 827 (quoting Batson, 476 U.S. at 97). It is the court's responsibility to determine whether there has been a purposeful discrimination on the part of the state. Batson, 476 U.S. at 98; State v. Bell, 745 S.W.2d 858, 867, after remand 759 S.W.2d 651, 654 (Tenn. 1988). "[T]he exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection." Ellison, 841 S.W.2d at 827. If the court were to determine

14

a neutral reason does not exist, the conviction must be reversed. Id. at 826; see also Batson, 476 U.S. at 100.

The defendant must show that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude [certain of] the venirem[e]n from the petit jury on account of their [gender]." Batson at 96 (alteration added). A trial court must look to the "totality of the relevant facts" to determine whether the state's use of peremptory challenges gives rise to an inference of discriminatory purpose. Bell, 759 S.W.2d at 653. In Turner, our supreme court clarified that peremptory challenges could be utilized by both the state and defendant in an effort to eliminate jurors perceived to be biased or unsympathetic: "Peremptory strikes, by definition, may be exercised for any reason unless that reason is specifically prohibited by legislation or by judicial decision." 879 S.W.2d at 821.

Here, the record reflects that the jury was composed of five men and seven women. Defense counsel used peremptory challenges to remove two male prospective jurors. The state used only three of its four peremptory challenges. The prosecutor challenged one juror because the juror did not believe that he had been treated fairly by the state in proceedings following his arrest some fourteen years earlier. The prosecutor, who had questioned another prospective juror about an arrest some ten or fifteen years before, believed she had caused the juror some embarrassment and thus, issued the second peremptory challenge. A third prospective juror was challenged due to his opposition to the death penalty. While this was not a capital case, the state argued that those opposed to capital punishment tend to be more "defense oriented." At the conclusion of an in camera

15

hearing, the trial judge ruled that the state had not engaged in any systematic exclusion.

In our view, the record does not support the defendant's claim of purposeful discrimination in the use of peremptory challenges. On appeal, the "trial court's finding of intentional discrimination is entitled to 'appropriate deference by a reviewing court.'" State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994) (quoting Batson, 476 U.S. at 98, n.21). In this instance, the trial judge observed voir dire, the demeanor of counsel, and considered the gender composition of the jury. The trial court specifically ruled that the state was not intentionally discriminating against men. The defendant has not alleged facts or circumstances that would convince us otherwise. Thus, we defer to the ruling of the trial court.

III

The defendant contends that the trial court erred by refusing to charge reckless homicide and criminally negligent homicide as lesser included offenses. The defendant was indicted for first degree murder; the jury was so charged.[1] The trial court also instructed the jury on second degree murder[2] and voluntary manslaughter.[3] The defendant's specific complaint is that the evidence also

---

[1]First degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1996).

[2]Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (Supp. 1996).

[3]Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

16

warranted an instruction on reckless homicide[4] and criminally negligent homicide.[5] The state argues that based upon the proof presented at trial neither instruction was warranted.

In State v. Trusty, our supreme court observed that "Tennessee law recognizes two types of lesser offenses ... : a lesser grade or class of the charged offense and a lesser included offense." 919 S.W.2d 305, 310 (Tenn. 1996). The trial judge has a statutory duty to charge the jury "on lesser grades or classes of the charged offense supported by the evidence." Id.; Tenn. Code Ann. § 40-18-110. The trial judge also has a duty grounded in case law to instruct the jury on lesser included offenses. Trusty, 919 S.W.2d at 311.

A lesser grade or class of the charged offense is determined by reference to the statutory scheme. State v. Wright, 618 S.W.2d 310, 315 (Tenn. Crim. App. 1981). For example, varying grades and classes of homicide are defined at Tenn. Code Ann. § 39-13-201 and codified at Tenn. Code Ann. §§ 39-13-202 et. seq.

The other type of lesser offense is one "necessarily included in the indictment." Trusty, 919 S.W.2d at 311. In Wright v. State, 549 S.W.2d 682 (Tenn. 1977), our supreme court outlined the test to determine whether an offense is lesser

---

[4]Reckless homicide is "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a). "'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur...." Tenn. Code Ann. § 39-11-302(c).

[5]Criminally negligent homicide is "[c]riminally negligent conduct which results in death ...." Tenn. Code Ann. § 39-13-212(a). "'Criminal negligence' refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur...." Tenn. Code Ann. § 39-11-302(d).

and included in the greater offense. Quoting the late Justice Weldon White in

Johnson v. State, 397 S.W.2d 170, 174 (Tenn. 1965), the court ruled as follows:

> The true test of which is a lesser and which is a greater
> crime is whether the elements of the former are
> completely contained within the latter, so that to prove
> the greater the State must first prove the elements of the
> lesser.

Wright, 549 S.W.2d at 685-86.

Two years later, our supreme court again addressed the subject:

> We believe that the better rule, and the one to be
> followed henceforth in this State, is the rule adopted
> implicitly by this court in Wright v. State, supra, that, in
> this context, an offense is necessarily included in another
> if the elements of the greater offense, as those elements
> are set forth in the indictment, include, but are not
> congruent with, all elements of the lesser. If there is
> evidence to support a conviction for such a lesser
> offense, it must be charged by the trial judge. T.C.A. §
> 40-2519 [now Tenn. Code Ann. § 40-18-118(a)]; Whitwell
> v. State, 520 S.W.2d 338 (Tenn. 1975).

Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979).

Second degree murder, reckless homicide, and criminally negligent

homicide are all lesser included and lesser grade offenses of first degree murder.

See State v. Belser, 945 S.W.2d 776, 790 (Tenn. Crim. App. 1996). Voluntary

manslaughter is a lesser grade offense of first degree murder. Id.; Trusty, 919

S.W.2d at 311; see Tenn. Code Ann. §§ 39-13-201 through -213.

The trial court has a duty to give a complete charge of the law

applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn.

1986). It is settled law that "where there are any facts that are susceptible [to an

inference] of guilt of any lesser included offense or offenses, then there is a

mandatory duty upon the trial judge to charge on such offense or offenses. Failure

18

to do so denies a defendant his constitutional right of trial by a jury." Wright, 618 S.W.2d at 315 (citations omitted). When there is a trial on a single charge of a felony, there is also a trial on all lesser included offenses, "as the facts may be." Strader v. State, 362 S.W.2d 224, 227 (Tenn. 1962). Trial courts may omit an instruction on a lesser included offense only when the record is devoid of evidence to support an inference of guilt of the lesser offense. State v. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990). There is an affirmative duty on the part of the trial judge to charge the jury on lesser included offenses charged in the indictment whether requested to do so or not. See Howard, 578 S.W.2d at 85.

Here, the defendant was charged with first degree murder, defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1996). To omit the instructions on reckless homicide and criminally negligent homicide effectively deprived the defendant of his right to jury on the issue. Our guiding principle is that if there is any evidence in the record from which the jury could have concluded that the lesser included offense was committed, there must be an instruction for the lesser offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975).

In State v. Boyce, 920 S.W.2d 224 (Tenn. Crim. App. 1995), this court ruled that an omission of a lesser included offense from the charge to the jury always requires a new trial. The opinion was largely based upon the ruling of our supreme court in Poole v. State, 61 Tenn. 288, 294 (1872):

> However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of the offense. However clear it may be, the Court should

never decide the facts, but must leave them unembarrassed to the jury.

There was some proof that the defendant struck the victim in a reckless or criminally negligent manner. The defendant testified that he intervened on behalf of his mother when the victim initiated an argument. He claimed that the victim grabbed him with both hands and was stabbed only because the defendant, who held a kitchen knife being used to cut onions, attempted to push away. The underlying theory was that the defendant either disregarded or was unaware of a substantial risk that he would stab the victim. The defendant testified, "[The victim] grabbed me and I felt cutting, and I just pushed him off of it. Which at the time I hit him, stabbed him, I guess. I hit him right here [in the left shoulder]." After the incident, the defendant remained at the scene and surrendered to police on their arrival.

During the deliberations, the jury submitted the following question to the trial court: "Do we have any other options of verdicts, for example, involuntary manslaughter?" Under these circumstances, it would be difficult to conclude that the record is devoid of any evidence upon which the jury could infer guilt of the accused of a lesser offense. The jury may have convicted the defendant of the lesser offense had it been charged; certainly, they would have considered it. An instruction on both of the lesser offenses was warranted even if the trial court viewed the testimony of the defendant as unworthy of accreditation. The right to a jury trial includes the consideration of all possible lesser grade and lesser included offenses. We are constrained to hold that the trial court's failure to instruct on reckless homicide and criminally negligent homicide requires a reversal of the conviction and the grant of a new trial as to the charge of voluntary manslaughter. A conviction for voluntary manslaughter, after the jury has been given a full opportunity

20

to consider a verdict on both first and second degree murder, serves as an acquittal as to first and second degree murder.  Price v. Georgia, 398 U.S. 323, 329 (1970).

IV

The defendant claims that the trial court erred by allowing the state to use evidence of a prior conviction for selling marijuana for purposes of impeachment.  See Tenn. R. Evid. 609.  Particularly, the defendant asks this court to revisit our decision in State v. Tune where we held that a felony drug possession conviction could be used for impeachment purposes.  872 S.W.2d 922, 927 (Tenn. Crim. App. 1993).  The state contends that the defendant has not demonstrated that he was prejudiced by the inquiry, particularly in light of the trial court's instruction to the jury.

The Tennessee Rules of Evidence provide that a judgement of conviction may be used by the state to generally impeach the testimony of the defendant:

> (a) General Rule.  For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
>
> (1) The witness must be asked about the conviction on cross-examination.  If the witness denies having been convicted, the conviction may be established by public record.  If the witness denies being the person named in the public record, identity may be established by other evidence.
>
> (2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.
>
> (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine

21

> that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609; State v. Morgan, 541 S.W.2d 385 (Tenn. 1976). A trial court's ruling under Rule 609 will not be reversed absent an abuse of discretion. See Johnson v. State, 596 S.W.2d 97, 104 (Tenn. Crim. App. 1979).

"In determining whether the probative value of a prior conviction on the issue of credibility is outweighed by its prejudicial effect on the substantive issues, a trial court should (a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction,' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (quoting N. Cohen, D. Paine, and S. Sheppeard, Tennessee Law on Evidence, § 609.9 at 288 (2d ed. 1990)); see also State v. Jerry Lee Finch, No. 02C021-9309-CC-00224 (Tenn. Crim. App., at Jackson, June 7, 1995). The defendant argues that marijuana sales have little, if any, relevance to the issue of his credibility. He contends that the rule is arbitrary because if he had sold a lesser amount of marijuana, the conviction would have been a misdemeanor, and thus, inadmissible.

Here, following a jury out hearing under Rule 609, the trial judge held as follows:

> I think it is a question for the Jury to determine whether or not a person who would be guilty of selling two counts of marijuana, would be guilty of coming here and maybe falsifying a statement. ... But basically speaking, I believe that a person who commits crime as closely related as this one is-- it's not stale ... when that crime is so

> unrelated to the crime for which we are investigating
> here, [the state] should be able to at least have that for
> the purpose of testing credibility, and credibility only.

Immediately following impeachment of the defendant by the state, the trial judge provided the jury with an appropriate instruction limiting the consideration of these prior convictions to the issue of credibility. These convictions may have served the state only marginally to illuminate the defendant's credibility. Yet, the prejudicial effect was also slight in that the convictions did not involve crimes of violence or the use of a weapon. Drugs were not involved in this matter. Under these circumstances, we cannot say that the trial court abused its discretion in admitting this evidence.

V

The defendant also insists that the trial court erred by imposing the maximum possible sentence of six years and argues that it should have suspended the entire sentence. He submits that the enhancing factors identified by the trial court are not proper under the Criminal Sentencing Reform Act of 1989 and that the trial court ignored valid mitigating factors. The state contends that the sentence is presumptively correct because the trial court followed the mandates of the 1989 Act. Although we have held that the defendant is entitled to a new trial, we will nonetheless address the question of sentencing.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see

23

State v. Jones, 883 S.W.2d 597 (Tenn. 1994).  The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

At the time of this offense, the presumptive sentence was the minimum in the range if there were no enhancement and mitigating factors.  Tenn. Code Ann. § 40-35-210(c).  Should the trial court find mitigating and enhancement factors, it must start at the minimum sentence in the range and enhance the sentence based upon any applicable enhancement factors, and then reduce the sentence based upon any appropriate mitigating factors. Tenn. Code Ann. § 40-35-210(e).  The weight given to each factor is within the trial court's discretion provided that the record supports its findings and it complies with the 1989 Act. See Ashby, 823 S.W.2d at 169.  The trial court should, however, make specific findings on the record which indicate its application of the sentencing principles. Tenn. Code Ann. §§ 40-35-209 and -210.

At the sentencing hearing, a former probation officer testified that the defendant had fulfilled the requirements of his probation satisfactorily for the two felony convictions of 1992. The defendant expressed remorse over the death of the

victim but denied stabbing the victim three times, insisting he had only "hit" the victim once. The trial judge found three enhancing factors including lack of candor, a history of criminal behavior, and the use of a deadly weapon. He found no mitigating factors and imposed the maximum sentence of six years.

Lack of candor with the court is not recognized by statute as an enhancement factor. Tenn. Code Ann. § 40-35-114. A lack of truthfulness or candor, cannot enhance the length of a sentence. State v. Thomas Anderson, No. 01C01-9504-CC-00103, slip op. at 19 (Tenn. Crim. App., at Nashville, Dec. 18, 1997). The trial court is limited to those factors set forth by the legislature. State v. Dykes, 803 S.W.2d 250, 258 (Tenn. Crim. App. 1990).

The defendant also contends that he does not have a history of criminal convictions or behavior. See Tenn. Code Ann. § 40-35-114(1). He characterized his prior felony drug convictions and traffic violations as "having little relevance on the question of sentencing for a manslaughter conviction, especially where drugs were not an ingredient of the killing." We disagree. The statute allows consideration of the prior offenses as an enhancement of the sentence.

The defendant also argues that Tenn. Code Ann. § 40-35-114(9), the employment of a deadly weapon during the commission of the crime, cannot be used to enhance his sentence because it is an element of the offense of voluntary manslaughter. A similar argument was rejected, however, in State v. Butler, 900 S.W.2d 305 (Tenn. Crim. App. 1994). In Butler, this court held that the use of a weapon was not an essential element of murder. Id. at 313. Therefore, this factor was properly considered.

25

The defendant specifically argued six mitigating factors at the sentencing hearing. After considering the arguments of counsel, the trial court refused to afford the defendant any mitigation: "I find nothing to show that [the victim] was anything other than in your mother's house, and he pushed your mother. ... The only mitigating factors that I see ... were considered by the Jury in arriving at this decision."

The defendant argues that he acted under strong provocation. Tenn. Code Ann. § 40-35-113(2). A conviction of the lesser included offense of voluntary manslaughter was apparently based upon the jury's conclusion that he acted under "adequate provocation." Our law does not prohibit trial courts from giving a defendant "double credit" by recognizing this as a mitigating factor. Yet, this court has previously ruled that the factor need not be automatically applied in voluntary manslaughter cases. See State v. McKinzie Monroe Black, No. 01C01-9401-CC-00006 (Tenn. Crim. App. at Nashville, July 14, 1995). Here, the victim was not armed. While the provocation in this case may have been adequate to reduce the degree of the defendant's culpability, the nature and circumstances of this crime do not necessarily demonstrate the kind of "strong provocation" required to mitigate the sentence. We, therefore, agree with the finding made by the trial court.

Next, the defendant submits that his conduct is justified although failing to establish a defense, Tenn. Code Ann. § 40-35-113(3), and that his weakened physical condition required that he use a weapon to keep peace in his mother's home. Tenn. Code Ann. § 40-35-113(8). He asserts that these factors are apparent from the proof developed at trial. We disagree. Some of the proof indicated that an argument erupted in the living room, and the victim pushed, but did not harm, the defendant's mother. The defendant intervened and stabbed the

26

victim, using deadly force and inflicting at least one deep stab wound to the victim's chest. The evidence does not sufficiently demonstrate that the defendant stabbed the victim due to a physical disability. See, e.g., State v. Michael Bailey, No. 03C01-9601-CR-00028 (Tenn. Crim. App., at Knoxville, Oct. 10, 1997). The jury concluded that the defendant struck the victim out of frustration or anger.

The defendant also asserts that he was motivated to provide necessities for his family and that the necessity that he attempted to provide was peace. Tenn. Code Ann. § 40-35-113(7). We find no merit in this assertion. This mitigating factor is largely encompassed in the defendant's claim of self-defense or defense of others. See State v. John D. Joslin, No. 03C01-9510-CR-00299 (Tenn. Crim. App., at Knoxville, Sept. 22, 1997). The jury rejected this theory. In our view, the trial court was warranted in rejecting the notion that the defendant was protecting his family from a "drunken assault" by the victim. Tenn. Code Ann. § 40-35-113(13). While the victim was drunk and apparently pushed the defendant's ailing mother, he was also unarmed. In our view, there was no error by the rejection of this claim.

Finally, the defendant argues that his actions do not indicate a sustained intent to violate the law. Tenn. Code Ann. § 40-35-113(11). There was some indication that the defendant armed himself with a lock-blade knife, opened the weapon, and then stabbed the victim one or more times. All of this suggests a sustained criminal intent. See State v. Johnson, 909 S.W.2d 461 (Tenn. Crim. App. 1995).

The defendant was eligible for a sentence ranging from three to six years. Tenn. Code Ann. § 40-35-112(a)(3). The trial court properly applied two

enhancement factors and improperly applied a third, thereby enhancing the defendant's sentence to six years. That the defendant, who has a history of criminal behavior, employed the use of a deadly weapon in the commission of the crime is entitled to particularly great weight. The trial court properly refused to apply each of the six mitigating factors proposed by the defendant. In our view, the six year sentence would have been warranted.

The defendant contends that he should have been permitted to serve his sentence on probation. Among the factors applicable to the defendant's application for probation are the circumstances of the offense, the defendant's criminal record, social history, and present condition, and the deterrent effect upon and best interest of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); Stiller v. State, 516 S.W.2d 617, 619-20 (Tenn. 1974). Especially mitigated or standard offenders convicted of Class C, D, or E felonies are presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, none of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a), (b). The ultimate burden of establishing suitability for probation, however, is still upon the defendant. Tenn. Code Ann. § 40-35-303(b).

Alternative sentencing issues must be determined by the facts and circumstances of the individual case. State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986). "[E]ach case must be bottomed upon its own facts." State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

There is no evidence in the record that the trial court considered probation in sentencing the defendant, despite his request.  At the time of this offense, the defendant lived with his mother and had held a steady job until 1986 when he contracted a lung disease and back injuries.  The defendant had fulfilled the terms of his 1992 probation and incurred no new charges, other than traffic violations, until this offense.  Those factors weigh in favor of a grant of probation.  The prior felony offenses, however, are unfavorable circumstances.   While the death of the victim, standing alone, is not an adequate basis for denying probation, State v. Butler, 880 S.W.2d 395, 400-01 (Tenn. Crim. App. 1994), the serious nature of the offense may warrant the denial of probation where "the offense, as committed, is 'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree' so as to outweigh all other factors of probation."  Id. at 400 (quoting State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981)).  The stab wounds to the chest are circumstances of the crime which would eliminate probation as a reasonable alternative.  A lack of candor would also support a term of incarceration rather than one of release in the community.  State v. Bunch, 646 S.W.2d 158 (Tenn. 1983).

The conviction is reversed.  Because there has been an acquittal on the greater offenses, the defendant must be retried on the voluntary manslaughter charge.

_____
Gary R. Wade, Judge

CONCUR:

_____
Joseph M. Tipton, Judge

_____
William M. Barker, Judge